# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Estate of Jennifer Louise Taschek et al., | Case No.: 2:23-cv-00280-JAD-EJY |
| Plaintiffs | |
| v. | **Order Denying Plaintiff's Motion to Strike, Granting in Part and Denying in Part Defendant's Motion to Strike, and Denying Cross-Motions for Summary Judgment** |
| Fidelity Life Association, | |
| Defendant | [ECF Nos. 25, 26, 27, 34] |

The Estate of Jennifer Taschek and Taschek's son, Michael Huerta, sue Fidelity Life Association because it denied Heurta's claim for benefits under Taschek's accidental-death-insurance policy. The Estate alleges that Fidelity's failure to pay gives rise to breach-of-contract, bad-faith, and unfair-insurance-practices claims under Nevada law. Fidelity and the Estate crossmove for summary judgment. Fidelity argues that it properly denied the insurance claim because Taschek was abusing her prescription medications, which precludes policy coverage. The Estate contends that her death was accidental, wasn't a suicide, and wasn't the product of prescription-medication abuse. Fidelity also moves to strike the Estate's expert's rebuttal report as untimely, and the Estate moves to strike Fidelity's late-filed summary-judgment response for the same reason.

I grant in part Fidelity's motion to strike because the Estate's rebuttal disclosure was untimely and it hasn't shown that this tardiness was harmless, so I disregard that report when resolving these crossmotions. I deny the Estate's motion to strike because Fidelity has shown that its untimely summary-judgment response was the product of excusable neglect. And I deny the parties' motions for summary judgment because there are genuine factual disputes on

material issues that go to whether Taschek was abusing prescription medications. So the Estate's breach-of-contract, bad-faith, and unfair-insurance-practices claims proceed to trial. But first, I refer this case to the magistrate judge for a mandatory settlement conference.

**Background**

**I.    Taschek dies from an alleged drug overdose.**

In November 2020, police responded to a report made by Taschek's brother of a possible drug overdose at Taschek's residence.[1] When officers arrived, they found Taschek lying on the floor and performed CPR.[2] Her brother told the officers that she abused prescription medications.[3] Fire & Rescue arrived shortly after and attempted life-saving measures but were unsuccessful.[4] When the coroner arrived, Taschek's brother also told him that Taschek currently abused her prescription medications and had a history of methamphetamine abuse.[5] But he denied that she bought pills off the street.[6] The coroner examined Taschek at the scene but didn't observe "any obvious trauma" or "signs of struggle or foul play."[7] He did find Taschek's medications on the kitchen table, however, and observed that there were "65 missing Risperidone pills and 28 missing Cyclobenzaprine pills if taken as directed."[8]

---

[1] ECF No. 37-4 at 5.
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] ECF No. 40-7 at 3–4.
[6] *Id.*
[7] *Id.* at 3.
[8] *Id.*

A medical examiner performed an autopsy and determined that Taschek's cause of death was "multiple drug toxicity" and that her "manner of death" was an "accident."[9]  Toxicology results showed the presence of a number of drugs in her blood, including "diazepam, oxazepam, temazepam, oxycodone, gabapentin, risperidone, hydroxyzine, and cyclobenzaprine."[10]  The medical examiner noted that this "combination of medication would have caused severe respiratory and central nervous system depression."[11]  Taschek's death certificate was issued several weeks later.  It reports her death as an accident caused by ingesting prescription medications.[12]

## II.    Fidelity denies Huerta's claim for benefits under Taschek's accidental-death policy.

Huerta made a claim for accidental-death benefits under Taschek's policy on November 24, 2020.[13]  Fidelity kept in contact with Huerta as it reviewed the claim and gathered additional information,[14] and it concluded the claim-investigation process in March 2021.[15]  Fidelity ultimately determined that benefits weren't payable under the policy because an exclusion applied "and the policy's definition of accidental death was not met."[16]  The exclusion that Fidelity relied on establishes that accidental-death benefits aren't payable when the death is

---

[9] ECF No. 40-8 at 2.

[10] *Id.* at 9; *see also* ECF No. 40-9 (toxicology report).

[11] ECF No. 40-8 at 3.

[12] ECF No. 40-15 at 2.

[13] ECF No. 40-5.

[14] *See* ECF No. 37-9 at 2.

[15] ECF No. 37-10 at 2.

[16] *Id.*

1 "caused or contributed to by the Insured's voluntary intake or use of any drug or substance" and

2 applies to prescription medications if the insured doesn't follow her doctor's instructions.[17]

3 **Discussion**

4 **I.    The Estate's motion to strike**

5     The Estate moves to strike as untimely Fidelity's response to the Estate's summary-

6 judgment motion.[18]  Fidelity's response was due on February 6, 2024,[19] but wasn't filed until

7 February 13, 2024.[20]  Fidelity concedes that its response was late, attributing the delay to a

8 calendaring error.[21]  But it argues that its response should be considered (rather than stricken)

9 because that mistake amounts to excusable neglect.[22]

10     **A.    The court considers Fidelity's excusable-neglect argument.**

11     The Estate argues that I don't need to reach the excusable-neglect question because

12 Fidelity didn't properly request leave to file a late response.[23]  Under Federal Rule of Civil

13 Procedure 6(b)(1)(B), a "court may, for good cause," extend deadlines "on motion made after the

14 time has expired if the party failed to act because of excusable neglect."  But Fidelity didn't

15 separately move for an extension, the Estate argues, instead simply filing its untimely summary-

16 judgment response and arguing excusable neglect in reaction to the Estate's motion to strike.[24]

17

18

---

19 [17] *Id.*

    [18] ECF No. 34.

20 [19] *See* ECF No. 25.

21 [20] ECF No. 33.

    [21] ECF No. 44.

22 [22] *Id.* at 3–4.

23 [23] *See* ECF No. 34 at 3; ECF No. 45 at 2–3.

    [24] *Id.* at 2.

4

1    Fidelity counters that courts should hear cases on the merits and that the Estate's summary-

2    judgment motion shouldn't be decided on a mere technicality.[25]

3         Rule 6(b)(1)(B) does establish that requests to enlarge an already lapsed deadline must be

4    made via motion. But it also "is to be liberally construed to effectuate the general purpose of

5    seeing that cases are tried on the merits."[26] District courts in this circuit have accordingly

6    exercised their discretion to construe late-filed briefs and other filings as extension requests

7    under Rule 6(b)(1)(B).[27] So although Fidelity's approach was to ask for forgiveness instead of

8    permission, I construe its summary-judgment response and the excusable-neglect argument it

9    makes in its motion-to-strike response as a request for an extension of time.

10       **B.**     **Fidelity has shown excusable neglect.**

11        "To determine whether a party's failure to meet a deadline constitutes 'excusable

12    neglect,' courts must apply a four-factor equitable test, examining: (1) the danger of prejudice to

13    the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the

14

---

15   [25] ECF No. 44 at 2–3.

16   [26] *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1259 (9th Cir. 2010) (quoting *Rodgers v. Watt*, 722 F.2d 456, 459 (9th Cir.1983)) (cleaned up).

17   [27] *See, e.g.*, *Lacy v. United States*, 2023 WL 4317659, at *13 (C.D. Cal. May 3, 2023)
18   (construing affidavit attached with late-filed summary-judgment motion "as a motion to extend pursuant to Rule 6(b)(1)(B)"); *Rios v. Nyenke*, 2022 WL 11141192, at *1 (E.D. Cal. Oct. 19, 2022) (construing objections to a magistrate judge's order "as incorporating a motion under Rule
19   6 . . . requesting an extension of time due to excusable neglect"); *Rivera v. Marriott Int'l, Inc.*, 2020 WL 1984891, at *2 n.2 (C.D. Cal. Apr. 23, 2020) (construing "apology and explanation for
20   the delay as a motion for extension of time under Fed. R. Civ. P. 6(b)(1)(B) "in the interest of efficiency and judicial economy"); *see also United States v. $163,500 in U.S. Currency*, 2024 WL 1603409, at *2 (D. Nev. Mar. 25, 2024) (construing pro se plaintiff's
21   late responsive filings "as including an implicit motion for an extension of time due to excusable neglect"); *N.L. v. Children's Hosp. L.A.*, 2019 WL 10854340, at *4 (C.D. Cal. Oct. 22, 2019)
22   (not requiring formal noticed motion under Fed. R. Civ. P. 6(b)(1)(B) "in the interest of efficiency and judicial economy"); *Taylor v. Garrison Prop. & Cas. Ins. Co.*, 2018 WL 5094912,
23   at *2 (C.D. Cal. Apr. 26, 2018) (exercising discretion to consider plaintiffs' two-day-late response to summary-judgment motion despite plaintiffs failing "to file a formal motion demonstrating excusable neglect").

1  reason for the delay; and (4) whether the movant acted in good faith."[28]  The Estate argues that

2  Fidelity's late response wasn't "due to good cause or excusable neglect."[29]  But most of the

3  Estate's discussion of this issue comprises general statements of law instead of any substantive

4  analysis of the excusable-neglect factors.[30]  Fidelity argues that its delay qualifies as excusable

5  neglect because it was short, the result of an inadvertent calendaring problem, and didn't stem

6  from bad faith.[31]

7          Fidelity's reason for the delay—a calendaring error—isn't particularly strong because the

8  delay was largely within Fidelity's control.  But the other factors all militate towards granting the

9  extension.  The amount of time the Estate had to reply wasn't shortened, and it hasn't otherwise

10  explained how this short delay prejudiced it.  The filing was a week late, but this hold-up didn't

11  delay resolution of the parties' summary-judgment motions or otherwise impact the progression

12  of this case.  And there is no indication that Fidelity acted in bad faith.  It contacted the Estate

13  and attempted to resolve this dispute amicably before filing, and the Estate hasn't argued (much

14  less shown) that Fidelity's delay was motivated by anything but flawed calendaring.  So I find

15  that Fidelity's tardy filing was the product of excusable neglect and thus deny the Estate's

16  motion to strike Fidelity's summary-judgment response.

17

18

19

20  [28] *Ahanchian*, 624 F.3d at 1261 (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
    507 U.S. 380, 395 (1993); *Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 381 (9th Cir.
21  1997)); *see also Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 825 n.4 (9th Cir.
    1996) (confirming that these factors apply when analyzing excusable neglect under Rule 6(b)).
22  [29] ECF No. 34 at 3.

23  [30] *Id.* at 3; ECF No. 45 at 2–3.

    [31] ECF No. 44 at 3–4.

## II.     Fidelity's motion to strike

Fidelity moves to strike a rebuttal report completed by the Estate's expert, Naresh Singh.[32]  The Estate didn't serve Singh's rebuttal report until November 12, 2023,[33] the day before the close of discovery and several weeks past when rebuttal reports were due under the scheduling order.[34]  The Estate counters that Fidelity didn't properly bring its motion under Rule 12(f).[35]  And it contends that, even if Fidelity's motion is proper, Singh's rebuttal report wasn't untimely because he was responding to new opinions that Fidelity's expert Lary Simms made in his rebuttal report, such a surrebuttal is permissible, and Singh's was served within 30 days of Simms's rebuttal and thus was timely under Rule 26(a)(2)(D)(ii).[36]

### A.     The Estate's Rule 12(f) and Local Rule 7-2(d) arguments are unpersuasive.

The Estate makes several rules-based arguments attacking the overall propriety of Fidelity's motion but they are all unavailing.  It first argues that Fidelity's motion should be denied because it was not brought under Rule 12(f), which is the "proper" rule for motions to strike.[37]  But Rule 12(f) governs motions to strike defenses or "any redundant, immaterial, impertinent, or scandalous matter" from *pleadings*, which is not the purpose behind Fidelity's

---

[32] ECF No. 38.  While Fidelity's initial motion to strike appears at ECF No. 26, it wasn't filed in accordance with local rules and was thus refiled at ECF No. 38.  The same is true of the Estate's response, which was originally filed at ECF No. 31 and refiled at ECF No. 42.  I cite these latter briefs and exhibits throughout.  I do the same for Fidelity's motion for summary judgment (initially filed at ECF No. 25 and refiled at ECF No. 37) and the Estate's response (initially filed at ECF No. 30 and refiled at ECF No. 41), and for the Estate's motion for summary judgment (initially filed at ECF No. 27 and refiled at ECF No. 40) and Fidelity's response (initially filed at ECF No. 33 and refiled at ECF No. 39).

[33] ECF No. 38-3 at 3–4.

[34] *See* ECF Nos. 14, 17, 22, 24.

[35] ECF No. 42 at 3–4.

[36] *Id.* at 4–5.

[37] *Id.* at 4.

motion.  Fidelity is moving for discovery sanctions under Rule 37, and such motions are commonly titled as motions to strike or exclude.[38]  The Estate's contention that Fidelity's motion is untimely under Rule 12(f)[39] fails for a similar reason—Fidelity didn't bring a Rule 12(f) motion to strike a pleading (or portions of one), so the deadline to file such motions doesn't apply here.  And the Estate's confusing argument that Fidelity didn't comply with Local Rule 7-2(d), which requires filing points and authorities in support of a motion, is just incorrect.[40]

**B.      Singh's rebuttal report was untimely.**

The Estate contends that Fidelity's expert Simms's rebuttal report contained "new information,"[41] which opened the door for the Estate to file a surrebuttal of its own under Rule 26(a)(2)(D).[42]  That rule establishes that expert disclosures must be made either 90 days before the trial date or, "if the evidence is intended to solely contradict or rebut evidence on the same subject matter identified by another party . . . , within 30 days after the other party's disclosure."[43]  Fidelity counters that this is a flawed reading of Rule 26.  The subsection of Rule 26 the Estate highlights isn't meant to open the door to additional rebuttals beyond those made to initial reports because, Fidelity contends, such an interpretation would permit an endless cycle of responsive reports.[44]

---

[38] *See, e.g.*, *Freteluco v. Smith's Food & Drug Ctrs., Inc.*, 2021 WL 183321, at *1 (D. Nev. Jan. 19, 2021) (motion to strike or exclude rebuttal expert); *Kuklock v. Nevada Dep't Transp.*, 2020 WL 7081582, at *1 (D. Nev. Dec. 2, 2020) (motion to strike supplemental expert report).

[39] ECF No. 42 at 5.

[40] *See* ECF No. 38 at 2–5.

[41] ECF No. 42 at 4.

[42] *Id.*

[43] Fed. R. Civ. P. 26(a)(2)(D)(ii).

[44] *See* ECF No. 32 at 4–5.

The Estate's arguments are materially flawed in several respects. The first problem is that the factual backbone of the Estate's position—that Singh was just responding to new theories Simms advances in his rebuttal—is entirely unsupported by attorney argument, explanations, or citations to the record. The Estate doesn't identify what these purportedly "new theories" are. Nor does it explain how Singh's report was addressing said theories. It merely claims that Simms put forth new theories in his rebuttal and leaves it at that.[45] This factual void in the Estate's arguments is highly problematic and would likely alone doom its position that Singh's rebuttal was indeed a timely response to new opinions from Simms.[46]

The Estate's theory also centers on an interpretation of a part of Rule 26 that isn't controlling here. Rule 26(a)(2)(D) establishes first and foremost that a party must make expert disclosures "at the times and in the sequence that the court orders." Rule 26(a)(2)(D)(ii)—which provides the 30-day-post-subject-matter-identification timeline that the Estate relies on in support of its surrebuttal argument—is a rule of default that applies only "[a]bsent a stipulation or a court order." And a scheduling order that covers expert disclosures has been entered in this case, so Rule 26(a)(2)(D)'s subsections don't apply here.[47] That scheduling order explicitly

---

[45] ECF No. 42 at 5.

[46] Since the Estate didn't attempt to provide facts to support this theory I need not address this in great detail, but I do note that at least some of Singh's rebuttal report appears to be responding to opinions from Simms's initial report. For example, Singh spends a paragraph listing—and then responding to—conclusions from Simms's initial report in order and almost verbatim, *compare* ECF No. 38-4 at 1–2 *with* ECF No. 37-12 at 7, though they don't appear in a similar section in Simms's rebuttal. *See* ECF No. 37-13. And of course, the presence of these opinions in Simms's initial report means they could not be new theories that Singh could properly address in his purported surrebuttal report (even assuming that they were also present in Simms's rebuttal report and a surrebuttal report was permissible in the first place).

[47] *See* ECF No. 14; *see also* ECF Nos. 17, 22, 24.

1 provides for only two rounds of expert disclosures (initial and rebuttal)[48] and thus doesn't

2 contemplate or permit additional, subsequent rounds of rebuttal-expert disclosures to respond to

3 new issues raised by a party's rebuttal experts.[49]  So Singh's rebuttal report wasn't timely.

4    **C.    The Estate hasn't shown that its delay was harmless.**

5    Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as

6 required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply

7 evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is

8 harmless."[50]  In determining whether a discovery-deadline violation was substantially justified or

9 harmless under Rule 37, courts consider: "(1) prejudice or surprise to the party against whom the

10 evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of

11 disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the

12 evidence."[51]  The party facing exclusion of its expert's testimony has the burden to prove that its

13 delay was either substantially justified or harmless.[52]

14

15

16 [48] *See* ECF No. 14.  The deadlines in the scheduling order were modified several times, but none of the amendments changed the two-round structure outlined in the initial scheduling order.  *See* ECF Nos. 17, 22, 24.

17 [49] This is not to say that a party has no way to obtain relief if another party offers as rebuttal

18 testimony a report that truly advances new opinions or contains new evidence instead of (or in addition to) rebutting or contradicting an initial expert report.  Such testimony is regularly the subject of motions to exclude or strike.  *See, e.g.*, *V5 Techs., LLC v. Switch, Ltd.*, 2020 WL

19 13134400, at *2 (D. Nev. Nov. 19, 2020) (excluding proffered rebuttal testimony that was "outside the scope of" the other party's initial expert's report); *Derzaph v. Wynn Las Vegas,*

20 *LLC*, 2018 WL 11384587, at *2 (D. Nev. Mar. 1, 2018) (declining to exclude rebuttal-expert testimony when "[t]he opinions offered in rebuttal were given to directly contradict the opinions

21 offered by" the other party's expert).

22 [50] Fed. R. Civ. P. 37(c)(1).

23 [51] *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)).

[52] *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

The Estate doesn't assert that this delay was substantially justified, only that it was harmless.[53] But that one-sentence assertion is the totality of its harmlessness argument.[54] The Estate doesn't even list the relevant factors much less analyze them, and such a feeble effort doesn't satisfy the Estate's burden to prove harmlessness. So I strike Singh's rebuttal report and don't consider it in deciding the parties' summary-judgment motions.[55] But if Fidelity seeks to preclude Singh from testifying to the opinions or observations contained in his surrebuttal report *at trial* it will need to move separately and timely to do so, specifying which new opinions should be excluded.[56]

## III.    Neither party is entitled to summary judgment.

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[57] The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[58] If the moving party satisfies its

---

[53] ECF No. 42 at 5.

[54] *Id.*

[55] I note, however, that even if I had factored Singh's rebuttal report into my summary-judgment analysis, it would not have changed my ruling.

[56] Fidelity argues that Singh shouldn't be able to "testify or otherwise supply evidence that relates to or is contained within the untimely disclosed rebuttal report." ECF No. 38 at 4. But excluding anything that merely relates to his rebuttal report would be overly broad relief and likely sweep up most (if not all) of the opinions in Singh's timely initial report. And while Singh's short rebuttal report may have raised some new points, he also provides opinions in it that overlap with those provided in his initial report. So at the appropriate time Fidelity must file a motion in limine specifying what topics or opinions it believes should be off limits at trial.

[57] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[58] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

1  burden with a properly supported motion, the burden then shifts to the opposing party to present

2  specific facts that show a genuine issue for trial.[59]

3        Who bears the burden of proof on the factual issue in question is critical.  When the party

4  moving for summary judgment would bear the burden of proof at trial (typically the plaintiff), he

5  "must come forward with evidence [that] would entitle [him] to a directed verdict if the evidence

6  went uncontroverted at trial."[60]  Once the moving party establishes the absence of a genuine

7  issue of fact on each issue material to its case, "the burden then moves to the opposing party,

8  who must present significant probative evidence tending to support its claim or defense."[61]

9  When instead the opposing party would have the burden of proof on a dispositive issue at trial,

10  the moving party (typically the defendant) doesn't have to produce evidence to negate the

11  opponent's claim; it merely has to point out the evidence that shows an absence of a genuine

12  material factual issue.[62]  The movant need only defeat one element of the claim to garner

13  summary judgment on it because "a complete failure of proof concerning an essential element of

14  the nonmoving party's case necessarily renders all other facts immaterial."[63]  "When

15  simultaneous cross-motions for summary judgment on the same claim are before the court, the

16

17

18  _____

19  [59] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 819 (9th Cir. 1995).

20  [60] *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation and quotations omitted)).

21  [61] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (citation omitted).

22  [62] *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

23  [63] *Celotex*, 477 U.S. at 322.

1   court must consider the appropriate evidentiary material identified and submitted in support

2   of"—and against—"both motions before ruling on each of them."[64]

3

4          **A.**    **There are genuine issues of material fact precluding summary judgment on the breach-of-contract claim.**

5       A breach-of-contract claim in Nevada requires (1) formation of a valid contract, (2)

6   performance or excuse of performance by the plaintiff, (3) material breach by the defendant, and

7   (4) damages as a result of the breach.[65]  Only the third element—whether Fidelity's refusal to

8   pay Taschek's designated beneficiary under the policy constituted a breach—is in dispute here.

9   And this element (and thus the claim) will seemingly rise or fall on whether Taschek taking more

10  than her prescribed medication dosages caused or contributed to her death, which will determine

11  whether the drug-overdose exclusion in Taschek's accidental-death-insurance policy applies.

12      The drug-overdose exclusion establishes that Taschek's policy won't pay out accidental-

13  death benefits if:

> [T]he Insured's death . . . [i]s caused or contributed to by the Insured's voluntary intake or use of any drug or substance, including poison, gas, fumes, or radiation, unless prescribed or administered by a Licensed Physician in accordance with a Licensed Physician's instructions regarding dosage of, frequency of, timing of, substances to take with or not to take with, and activities not to perform when taking, the prescribed or administered medication.[66]

---

[64] *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

[65] *See Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987) (quoting *Malone v. Univ. of Kansas Med. Ctr.*, 552 P.2d 885, 888 (Kan. 1976)).

[66] ECF No. 39-2 at 9.

Fidelity maintains that it properly denied the insurance claim under this exclusion and thus no breach has occurred. According to its expert Simms, toxicology-report results reflect drug levels that are higher than one would expect if Taschek had been taking her medications as prescribed.[67] Fidelity also points to other evidence suggesting that Taschek was abusing her prescription medications.[68] The Estate argues that the autopsy report and its expert Singh's opinions establish that it is entitled to summary judgment. The thrust of its argument is that the coroner and Singh concur that Taschek's death was accidental rather than a suicide, so Fidelity should have paid out the claim.

### i. The fact that the coroner labeled Taschek's death accidental and not a suicide isn't determinative.

The Estate's arguments center on the coroner labeling Taschek's death an accident rather than a suicide, a conclusion that Singh agrees with.[69] And it highlights that there isn't any other evidence supporting a theory that Taschek was suicidal.[70] But Fidelity doesn't deny that Taschek's death was accidental within the general meaning of that term.[71] Nor does it take the position that Taschek intended to commit suicide,[72] which would bring her death outside the policy's definition of an accidental death.[73] Fidelity instead contends that Taschek's death was the product of her abusing her prescription medications,[74] which (if true) would trigger the drug-

---

[67] ECF No. 37 at 11–14.

[68] *Id.* at 14.

[69] ECF No. 40 at 7–12.

[70] *See id.*

[71] ECF No. 37 at 13.

[72] *See id.*

[73] ECF No. 37-2 at 6.

[74] ECF No. 37 at 13.

overdose exclusion in Taschek's policy, an exclusion that precludes coverage for drug-related deaths unless the at-issue drugs were prescribed *and* taken in accordance with a doctor's instructions.[75]  Indeed, this is the position that Fidelity took when it initially denied coverage under that exclusion.[76]  So the fact that Taschek's death was categorized as accidental on the autopsy report and death certificate isn't enough to get this case outside of the exclusion and demonstrate that Fidelity is thus in breach for not paying accidental-death benefits to the Estate.

### ii. *Conflicting expert opinions preclude summary judgment on whether the drug-overdose exclusion applies.*

The parties' experts offer contradictory opinions on whether Taschek was following her physicians' instructions or taking more of her medications than she was supposed to.  The Estate's expert Singh agrees with the coroner that Taschek's death was accidental and not a suicide, but as explained *supra* that isn't enough here.  Singh otherwise opines that Taschek was prescribed the medications that ultimately caused her death and wasn't taking someone else's medication.[77]  He also states that postmortem toxicology results don't accurately reflect when medications were taken—especially because of Taschek's long-term prescription drug use and consequent buildup of drug levels and tolerance.  But while Singh's opinions cast some doubt on whether Taschek was abusing her medications, they don't confirm that she was, in fact, taking them in their prescribed dosages such that no reasonable jury could find for Fidelity.[78]  And even

---

[75] ECF No. 39-2 at 9.

[76] *See* ECF No. 37-2 at 6.

[77] ECF No. 40-16 at 4.

[78] I note, however, that it will ultimately be Fidelity's burden to "establish that the exclusion clearly applies to this particular case."  *See Powell v. Liberty Mut. Fire Ins. Co.*, 252 P.3d 668, 674 (Nev. 2011) (citing *Alamia v. Nationwide Mut. Fire Ins. Co.*, 495 F.Supp.2d 362, 367 (S.D.N.Y. 2007)); *see also Nat'l Auto. & Cas. Ins. Co. v. Havas*, 339 P.2d 767, 768 (Nev. 1959) (holding that it is the insurer's burden to prove that exceptions from coverage apply).

if they did go so far, the Estate still wouldn't be entitled to summary judgment because Fidelity's expert Simms opines that Taschek was abusing her medications and that this caused her death, creating a genuine issue of material fact.

Fidelity's breach-of-contract arguments rely on Simms's report, and he opines that Taschek's death was "directly due to her voluntary of intake of prescription drugs not in accordance with the prescribed dosage."[79]  He reaches this conclusion in large part because the toxicology report reflected that "postmortem levels of oxycodone and hydroxyzine were elevated into the lethal ranges indicating excessive use."[80]  But in his rebuttal report, Simms concedes (in response to Singh's critique of using postmortem toxicology results to reach such conclusions) that "[p]ostmortem levels of some drugs can increase significantly from the antemortem level while other drugs do not increase significantly from the antemortem level."[81]  And he notes that some studies have reported oxycodone as having "significant postmortem redistribution" while other studies have found it has none.[82]  Simms still opines that, while "postmortem drug levels are not exact," for oxycodone and hydroxyzine[83] "the postmortem drug levels more likely than not are either the same or nearly the same as antemortem blood levels."[84]  Regardless, Simms's opinion on this point—a point that is one of the tentpoles for his conclusion that Taschek's death

---

[79] ECF No. 37-12 at 8.

[80] *Id.*

[81] ECF No. 37-13 at 4.

[82] *Id.*

[83] According to Simms, "studies have generally shown that significant postmortem redistribution does not occur" for hydroxyzine.  *Id.*

[84] *Id.*

1    was caused by her taking more than her prescribed dosages[85]—conflicts with Singh's, and this

2    court is not permitted to resolve such a battle of the experts on summary judgment.[86]

3              ***iii.        Fidelity's quasi-exclusion arguments are unavailing.***

4              Fidelity also contends that Singh's own statements and background demonstrate that he

5    isn't qualified to offer the opinions that he has here,[87] but its arguments are unpersuasive.  While

6    Fidelity suggests that Singh "could be excluded based on his lack of credentials" because his

7    practice areas don't involve "review of post-mortem drug toxicity reports,"[88] Fidelity didn't

8    move to exclude all of Singh's opinions, only to strike as untimely his rebuttal report.[89]

9    Regardless, Singh is a medical doctor, and he has at least some relevant experience upon which

10   his opinions are apparently based.[90]  And even if his "conclusions [are] shaky, they should be

---

[85] Simms also bases this conclusion in part on a "scene investigation" that "found that the decedent was taking several medications at an excessive rate."  ECF No. 37-12 at 8.  The coroner did find a number of missing risperidone and cyclobenzaprine pills that suggested Taschek hadn't been taking those medications as directed, and her brother told the coroner that she abused her prescriptions.  *See* ECF No. 40-7 at 3–4.  But at least according to Simms, Taschek's postmortem risperidone and cyclobenzaprine levels were well within the therapeutic range.  *See* ECF No. 37-12 at 6.  And in his rebuttal, Simms stated that the forensic issue of pill count was "moot" because of this.  ECF No. 37-13 at 6.

[86] *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat.").

[87] ECF No. 37 at 12.

[88] *Id.*

[89] To the extent Fidelity is arguing in its summary-judgment briefing that Singh's opinions should all be excluded because he is unqualified, that argument should have been made in a separately filed *Daubert* motion.  *See* L.R. I.C. 2-2(b) ("For each type of relief requested or purpose of the document, a separate document must be filed and a separate event must be selected for that document.").

[90] ECF No. 40-16 at 5–6 (noting that Singh has 25 years of experience "being the director of pulmonary and critical care services" at a hospital, was a principal instructor for those specialties, worked in the intensive-care unit at a hospital treating people with drug overdoses, and has "observed different individuals metabolizing various drugs in their system at different rates").

attacked by cross examination, contrary evidence, and attention to the burden of proof"[91] at trial

because "it is the job of the fact finder, not the trial court, to determine which source is more

credible and reliable."[92]  Fidelity similarly contends that Singh "disqualifies himself as an expert

who can opine on the relationship of antemortem and postmortem concentrations of drugs in a

deceased individual"[93] because Singh stated that his opinions regarding autopsy drug testing

could be confirmed by a lab medical research officer.  But this doesn't establish (and at no point

does Singh state) that *only* a lab MRO is qualified to offer the relevant postmortem-drug-

concentration opinions in Singh's report.

> ### iv.    *Fidelity's reckless-conduct theory rises or falls on the same disputed facts as its drug-overdose-exclusion theory.*

Fidelity also argues (though almost in passing) that Taschek's death falls outside the

definition of a covered accidental death because it was caused or contributed to by her own

reckless conduct.[94]  Under the policy, for a death to be a covered "Accidental Death" it must be

"solely due to Accidental Bodily Injury," and the policy expressly excludes from that term an

injury caused by the insured's own reckless conduct.[95]  But the purportedly reckless conduct at

issue here—prescription-medication abuse—is the same disputed conduct that will determine

whether the drug-overdose exclusion ultimately applies.  So to the extent that Fidelity is arguing

---

[91] *See City of Pomona*, 750 F.3d at 1049 (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)) (cleaned up).

[92] *Id.* (citing *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

[93] ECF No. 37 at 12.

[94] *Id.* at 13.

[95] ECF No. 37-2 at 6.  The policy defines reckless conduct as "conduct whereby the Insured is careless or indifferent to the potential consequences, including potential fatal consequences, of his/her actions and behavior."  *Id.*

for a separate, reckless-conduct theory as to why its denial of benefits was appropriate, that too will need to proceed to trial.

In sum, Fidelity does have substantial evidence to support its theory that prescription-drug abuse caused or contributed to Taschek's death. But there are conflicting expert opinions that bear on whether Taschek wasn't taking her medications as directed, and I cannot say that no reasonable jury could find for the Estate on this record. So the breach-of-contract claim must proceed to trial.

**B.    Neither party has demonstrated that it is entitled to summary judgment on the bad-faith and NRS 686A.310 claims.**

Under Nevada law, "[e]very contract imposes upon each party a duty of good faith and fair dealing."[96] A breach of this implied covenant, which can sound in both contract and tort, occurs when "the terms of the contract are literally complied with but one party to the contract deliberately [contravenes] the intention and spirit of the contract."[97] Implied-covenant claims may be brought to censure a broad swath of "grievous and perfidious conduct,"[98] including an insurer's unreasonable or bad-faith denial of a claim, unreasonable delay in settling a claim, and failure to inform an insured of a settlement offer.[99] And NRS 686A.310(1)(e)[100] similarly

---

[96] *A.C. Shaw Const., Inc. v. Washoe Cnty.*, 784 P.2d 9, 9 (Nev. 1989) (internal quotation marks and citations omitted).

[97] *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991).

[98] *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 934 P.2d 257, 263 (Nev. 1997).

[99] *Allstate Ins. Co. v. Miller*, 212 P.3d 318, 310 (Nev. 2009) ("This court has previously held that a bad-faith action applies to more than just an insurer's denial or delay in paying a claim.").

[100] The Estate brings a cause of action under "NRS 686A.310 and NAC 686A" for unfair practices. *See* ECF No. 40 at 14. But it doesn't specify—either in its complaint or its summary-judgment briefing—which of the more than a dozen unfair practices described in NRS 686A.310 it believes provides a viable theory here. The only one that seems to apply given these facts and the arguments the Estate advances is NRS 686A.310(1)(e). And the Nevada Insurance Commissioner has exclusive authority to enforce the provisions of the Nevada Insurance Code,

1  prohibits insurers from "[f]ailing to effectuate prompt, fair[,] and equitable settlements of claims

2  in which liability of the insurer has become reasonably clear."

3      The Estate's arguments as to why it is entitled to summary judgment on these claims

4  largely mirror those it offers in support of its breach claim and are unpersuasive for similar

5  reasons.[101]  It focuses on the fact that the autopsy report and death certificate describe Taschek's

6  death as accidental, arguing that denying an accidental-benefits claim under those circumstances

7  amounts to bad faith and an unfair practice under NRS 686A.310.[102]  But as explained *supra*,

8  whether Taschek's death was accidental within the general meaning of that term is neither in

9  dispute nor determinative of whether Fidelity has to pay out the insurance claim.  The Estate

10  hasn't established that denying the claim was incorrect, much less that doing so amounted to bad

11  faith or an unfair-claims practice.  And it therefore isn't reasonably clear that Fidelity is liable to

12  the Estate.[103]

13      For its part, Fidelity argues the breach-of-contract and bad-faith claims together, so its

14  bad-faith arguments are no different than those made in support of its positions on the breach-of-

15  contract claim.[104]  And it contends that summary judgment is warranted on any unfair-claims-

16

17

18  so the Estate can't bring a claim under NAC 686A.  *See Allstate Ins. Co. v. Thorpe*, 170 P.3d
989, 994 (Nev. 2007); Nev. Rev. Stat. § 679B.120(3); *see also* Nev. Rev. Stat. § 686A.310(2)
(granting a private right of action to redress unfair claims practices described solely in that
19  section "[i]n addition to any rights or remedies available to the Commissioner").  So this case
proceeds to trial only on an unfair-practices theory under NRS 686A.310(1)(e).

20  [101] *See* ECF No. 40 at 12–15.

21  [102] *Id.*

22  [103] Though neither party addressed this issue, I would also be precluded from granting summary-
judgment for the Estate on its NRS 686A.310 claim because it hasn't shown that an officer,
director, or department head at Fidelity knew of and permitted the allegedly unfair practice at
23  issue here.  *See* Nev. Rev. Stat. § 686A.270.

[104] ECF No. 37 at 11–14.

practices theories solely because the Estate "cannot show that [Fidelity] breached any contract with [the Estate] or [] committed any act of bad faith."[105]  But the breach-of-contract claim proceeds to trial, and the same genuine issues of fact that preclude summary judgment on that claim leave quick resolution out of reach on the bad faith and NRS 686A.310(1)(e) claims, too. So I deny summary judgment on those extra-contractual claims.

### Conclusion

IT IS THEREFORE ORDERED that the Estate's motion to strike Fidelity's response to the Estate's motion for summary judgment **[ECF No. 34] is DENIED.**

IT IS FURTHER ORDERED that Fidelity's motion to strike the Estate's rebuttal report from Singh **[ECF No. 26] is GRANTED IN PART AND DENIED IN PART.**  Singh's rebuttal report is stricken for the purposes of these crossmotions, but if Fidelity seeks to limit Singh from testifying on opinions or observations contained in his rebuttal report at trial it will need to move separately and timely to do so before trial, specifying which new opinions should be excluded.

IT IS FURTHER ORDERED that the Estate's motion for summary judgment **[ECF No. 27] is DENIED.**

IT IS FURTHER ORDERED that Fidelity's motion for summary judgment **[ECF No. 37] is DENIED.**

IT IS FURTHER ORDERED **that this case is REFERRED to the magistrate judge for a MANDATORY SETTLEMENT CONFERENCE.**  The parties' obligation to file their joint pretrial order is STAYED until 10 days after that settlement conference.

_____
U.S. District Judge Jennifer A. Dorsey
July 18, 2024

---

[105] *Id.* at 18.